Jerry T. SMITH, Appellant,

v.

The STATE of Texas, Appellee.

No. 07–97–0032–CR.

Court of Appeals of Texas, Amarillo.

March 26, 1998.

James J. Napper, Lamesa, for appellant.

Ricky B. Smith, District Attorney, Sammy M. McCrary, Assistant District Attorney, for appellee.

Before DODSON and QUINN and REAVIS, JJ.

REAVIS, Judge.

Upon a plea of not guilty, a Garza County jury found appellant Jerry T. Smith guilty of murder, although the victim's body was never recovered and no physical evidence of the crime was ever found. After pleading true to an enhancement allegation, appellant's punishment was assessed by the court at life in prison. By four points of error, appellant contends (1) & (2) the trial court erred in allowing the State to introduce extraneous offense evidence during the guilt-innocence phase of trial, and (3) & (4) the evidence is legally and factually insufficient to sustain his conviction. We will affirm.

Before trial, the State gave notice of its intent to introduce extraneous offense evidence during the guilt-innocence phase of trial. After jury voir dire was complete, but before the jury was empaneled, a hearing was held regarding the admissibility of such evidence. No testimony was presented and the State did not identify who would testify to which extraneous offenses. The State argued that an absence of physical evidence linking appellant to the murder created an essential need for it to introduce evidence that on numerous occasions, and while intoxicated, appellant had physically assaulted his father, his ex-wife, and the victim. Appellant objected to this evidence, asserting Texas Rules of Criminal Evidence 404(b) and 403. His objections were overruled, but the court granted his request for an instruction in the jury charge on the limited use of extraneous offense evidence.[1]

## THE FACTS

At trial, the State's evidence consisted of 25 exhibits and the testimony of 24 witnesses, including several friends and neighbors of the victim, her sister, her daughter, her postman, a former Mental Health and Mental Retardation (MHMR) worker assigned to monitor elderly members of the community, five present or former Garza County Sheriff's officials, appellant's ex-wife, appellant's former cellmate, to whom appellant made an extra-judicial confession, and an Assistant Tarrant County District Attorney. Appellant called four witnesses and proffered three exhibits.

The evidence adduced during the guilt-innocence phase of trial established that, before her disappearance on June 3, 1993, the victim, Edna Blodgett, a widow in her mid

---

1. The jury was instructed in the charge that it could consider the extraneous offenses only for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, or identity, and for no other purpose. However, the court did not provide limiting instructions to the jury each time evidence of an extraneous offense was introduced.

70's, lived in a trailer house and was a long-time resident of the small community of Post. She owned a car, but had recently given up driving and often carried her small dog under her arm as she walked around town. She frequented many local establishments almost daily, including the sheriff's office, and was well known among local residents. According to witnesses, she enjoyed living in Post and took great pride in maintaining the garden around her home. She lived on approximately $600.00 in Social Security benefits and was described as being both "fiercely independent" and oriented to her surroundings. Several witnesses testified that the victim would have informed them if she had planned on leaving town, and that it was unlikely that the victim just wandered off. It was also opined however, by a non-expert witness, that the victim suffered from Primary Degenerative Dementia, "probably Alzheimer's," and sometimes appeared confused.[2]

Sometime in 1987, appellant, who was in his mid 40's, befriended the victim and eventually became her "part-time live-in boyfriend." The record provides scarce insight into their relationship aside from exposing an abundance of physical abuse inflicted upon the victim by appellant while he was intoxicated.

References to appellant's physical abuse of the victim began with the State's first witness and continued throughout the guilt-innocence phase of trial. Witness after witness testified about how scared the victim was of appellant, and how she did not like to be around him when he was drinking, because he physically assaulted her by hitting and kicking her. Many witnesses recalled specific occasions when they observed bruises, scratches and abrasions on the face, arms, and legs of the victim, and one witness recalled observing more than one black eye. Another witness recalled picking the victim up at a convenience store in the middle of the night after she had been severely "beat up." Still another recalled a night when the victim was so scared of appellant that she and her dog spent the night in the cab of a pickup truck.

Neighbors and friends alike testified that on numerous nights the victim showed up at their homes, battered and bruised, crying and scared, seeking refuge for the night because appellant was drunk and assaultive. Furthermore, the victim's auto mechanic recalled her asking to store her car in his garage because appellant was drunk and she was fearful he would vandalize it.

Several of the same witnesses testified that they had been worried for the victim's safety and believed she might "wind up" dead as a result of appellant's physical abuse. Many of these same witnesses opined that appellant's violence was linked to his excessive consumption of alcohol, and that the level of his violence was escalating and likely to lead to a tragic ending.

Billy Timms, a former Garza County Sheriff's Deputy, described numerous domestic dispute calls from the victim. He recalled a specific occasion when he responded to an emergency call in which the victim claimed appellant had killed her dog. When he arrived he found the dead dog inside the victim's house. From its appearance, and from the amount and pattern of blood on the wall and curtain, he opined that the dog had been kicked and stomped to death. Later the same day he responded to a second call in which the victim claimed appellant had smashed all the mirrors and windows out of her car with a two-by-four. Timms arrested appellant for criminal mischief after he found him on the victim's couch with several glass cuts. Timms opined that women in these types of abusive relationships often "wind up" dead, and he recalled expressing his concern to the victim that she was going to get killed if she did not get away from appellant.

Finally, Timms testified to his familiarity with a September 1985 incident in which appellant severely beat his 75 year old fa-

---

2. On at least one occasion the victim expressed her belief that her grandchildren were going to school in Post when in fact they were not, and that her husband was still alive after he had been dead for several years. Garza County Sheriff's officials testified that the victim once telephoned the sheriff's office to complain that her phone jack was missing and, on another occasion, she believed there were horses on the roof of her house.

ther. The incident led to appellant's conviction for injury to an elderly person. Through Timms's testimony the State offered ten exhibits into evidence: eight photographs depicting various injuries to appellant's father, a statement by appellant's father in which he gave a detailed description of the beating, and a portion of a statement of facts in which appellant stipulated to the truth of his father's assault allegations.[3] When these ten exhibits were offered into evidence by the State, appellant's counsel affirmatively stated that he had "no objection." Minutes later however, appellant's counsel made the only renewal of his pre-trial 404(b) and 403 objections.

Immediately after appellant's counsel renewed his pre-trial objections, Joy Browning, who was married to appellant from February 1980 until March 1983, testified extensively to the physical abuse she suffered at the hands of appellant. She recalled the frequency with which appellant got drunk and then struck her, kicked her, and pulled her hair. She recalled a specific beating when her nose was broken and a tooth was knocked out, and a second incident when she was hurt so badly she was unable to work or climb stairs. She also testified that on one occasion appellant put a gun to her head and threatened to kill her. Finally, she testified that after she divorced appellant he came by her house and threw rocks through her windows and broke down her door.

After appellant's ex-wife and 14 other witnesses had testified to appellant's physically abusive tendencies, the State offered into evidence a December 1990 application by the victim for a protective order, her accompanying affidavit, and the subsequently issued court order. Appellant's counsel affirmatively acquiesced in the introduction of these documents by announcing that he had "no objection." Within the application, the victim claimed the protective order was necessary because:

> Jerry Smith was out drinking and came home drunk. When I came home he attached [sic] me by pushing me, hitting me with closed fists, pulling my hair and punching my chest. He then punched me in the face leaving me bruised and leaving scrapes on my head. I ran barefooted to Allsup's where the police picked me up.

In the accompanying affidavit, the victim also stated that in the past, "Jerry Smith has killed my dog by stomping him to death, [and] has recently threatened that he would have me put into a home for the aged if I didn't do what he wanted me to do."

The testimony regarding the days and weeks immediately preceding and following the victim's disappearance revealed that from October 17, 1992 until May 12, 1993, appellant was held in the Garza County jail on DWI charges. In exchange for having the charges dropped, he agreed to be transferred to the VA Hospital in Waco for treatment. From the hospital he telephoned an automotive shop in Post to request that his car be repaired. He informed the mechanic that he needed his car to be operational when he returned because he and the victim were going to get married.[4] Appellant was released from the hospital on May 25, 1993, and subsequently returned to Post and to living in the victim's house.

On the morning of June 2, 1993, appellant and the victim ate breakfast at the Corner Deli in Post. As they left, the victim told the owner of the deli, a longtime friend, that she would see him on Monday. He never saw her again. That afternoon an MHMR worker assigned to monitor elderly members of the community, went by the victim's house for her weekly visit. While she met with the victim, appellant came home and expressed his dissatisfaction with her presence by interrupting their conversation and spraying bug

---

**3.** The written statement initially references prior beatings and then graphically describes how appellant dragged his sleeping father out of bed, hit him, kicked him, threw him to the floor, ripped his bloody clothes from his body, forced him to clean up the mess, and then kept him awake all night by periodically continuing the beating. Moreover, the statement contains appellant's fa-

ther's concern that appellant would kill him the next time.

**4.** Two witnesses testified that appellant told them he was going to marry the victim, but no witnesses testified to ever being informed by the victim that she was going to marry appellant.

repellant inside the house. When the MHMR worker left, the victim and appellant were together. It was the last time anyone saw the victim alive.[5]

Appellant's auto mechanic testified that appellant was drunk when, at around 3:30 p.m. on June 3,[6] he came by the repair shop to retrieve his car. At around 4:30 p.m., appellant was spotted by two oilfield workers in a remote area north of Post, sitting behind the wheel of his car, which was parked in a gully off a dirt road. As the two oilfield workers drove by, appellant appeared surprised, yelled something unintelligible, and waved his hand out the window as if to "shoo them off." He appeared red in the face as if he were "drunk or mad."

Later that evening, appellant drove to visit his brother Robert in Magazine, Arkansas. He arrived early the following morning and stayed in one of his brother's two houses. While there, and in the presence of his sister-in-law, appellant made an unsuccessful attempt to telephone the victim. After spending three or four days in Magazine, he returned to Post and to living in the victim's house. The victim was nowhere to be found.

The evidence indicates that the victim's absence was not immediately detected. However, when she stopped coming by the sheriff's office to visit, and appellant began calling the dispatchers and harassing them over the telephone, the dispatchers became concerned.

On June 7, the MHMR worker went by the victim's house for her weekly visit, but was unsuccessful in locating the victim. She returned on June 11, but was again unsuccessful in locating the victim. When she returned for a third time on June 14, she noticed that the victim's garden had not been cared for and, when she discovered the house unlocked and learned that neighbors had neither seen nor heard from the victim, she became alarmed and filed a missing persons report.

After the missing persons report was filed, sheriff's officials began actively searching for the victim. They went to her house; they checked bus and airline terminals; they interviewed garbage collectors, the victim's postman,[7] her friends, family members, neighbors, and witnesses who claimed to have seen an elderly woman matching the victim's description. Posters bearing the victim's picture were displayed around town and, after sheriff's officials learned two oilfield workers had observed appellant in an isolated area north of town, an extensive search of that area was conducted using a helicopter, an airplane, men on horseback, and dogs. A sheriff's official testified that every lead was followed and he estimated that several thousand man hours were spent trying to locate the victim. Members of the community also participated in searching for the victim, but appellant, who was living in the victim's house, and had recently expressed his intention to marry her, never reported her missing, and did not participate in searching for her. Neither the victim's body nor any physical evidence of a crime was ever discovered.

On or about June 20, sheriff's officials visited with appellant at the victim's house and informed him not to "mess" with any of the victim's belongings. Sheriff's officials then informed the victim's bank to watch for forged checks drawn on her account. Two days later, appellant was arrested after he passed a $100.00 check drawn on the victim's account. He admitted to forging the check on June 20, but had no explanation for why he dated the check June 3. He subsequently pled guilty and was sentenced to 10 years confinement in the Institutional Division of

---

5. According to sheriff's officials, three people reported seeing a woman matching the victim's description around the time of her disappearance and in the vicinity of Post. However, of the two eyewitnesses who testified, only one witness claimed to have positively identified the woman as Ms. Blodgett and he could not recall whether it was before or after June 3.

6. Hereafter, all references to dates are to the year 1993, unless otherwise specified.

7. The postman, who had known the victim for 30 years, testified that the victim frequently met him at the mailbox to receive her mail firsthand, but had quit coming out to greet him, and had quit taking the mail out of her box. He also testified that the victim had not left a forwarding address.

the Texas Department of Criminal Justice.[8]

While confined at the Middleton Unit outside Abilene in 1995, appellant met fellow inmate John Yarbrough. The two men shared a dormitory and worked in the prison laundry together. As they became acquainted, appellant confided in Yarbrough and made incriminating statements regarding the victim's disappearance. Yarbrough, a former police officer serving a life sentence for murder, began recording the details of appellant's statements in a notebook. He then sent a letter and his notes to Greg Miller, an Assistant Tarrant County District Attorney, reporting much of what he had learned. Miller, who testified that he believed Yarbrough to be credible, and his information to be accurate, in turn relayed the information to members of the Garza County Sheriff's Department.

Yarbrough testified that appellant informed him he lived in a trailer house in Post with a woman named Edna Blodgett; his excessive drinking caused problems in their relationship; Blodgett's family disapproved of him; and he was serving time for passing a forged check drawn on her account. Appellant further informed Yarbrough that Blodgett had been missing for a while, and that he, appellant, "guessed she probably got burned up" and would never be found. Although appellant never explicitly said that he killed Blodgett, when Yarbrough asked him what he meant, appellant informed Yarbrough that there was no need for blood when you kill someone, and told him if you pack dirt around a 55 gallon drum, use high octane gasoline, and keep the temperature up around 900 degrees for an hour and a half, a human body will completely disintegrate. When Yarbrough jokingly asked whether they made "Post Toasties" in Post, appellant claimed he made one "Post Toasty."

Yarbrough further testified that appellant claimed that because the victim typically rode in his car there would be nothing unusual about finding evidence of her presence within the vehicle. Moreover, because there was no body to find, and because eyewitnesses had purportedly seen the victim after appellant left for Arkansas, appellant was confident he would never be convicted of the crime.

Finally, Yarbrough testified that appellant informed him that he initially left the victim's body in Post and began driving to his brother's house in Arkansas before deciding to return and retrieve the body for disposal. Before leaving Post a second time, he telephoned his brother to let him know he was coming.[9]

### POINTS OF ERROR (1) & (2)

By his first two points of error, appellant contends the trial court erred in allowing the State to introduce evidence that he physically assaulted his father, his ex-wife and the victim, over his timely 404(b) and 403 objections. We disagree.

█ Initially, we note that appellant's first two points of error do not comply with Texas Rule of Appellate Procedure 74(d), as they fail to reference with specificity the pages in the record which contain the complained of evidence.[10] Moreover, the argument portion of his brief does not address nor reference the specifically complained of evidence. Tex. R.App.P. 74(f). We are generally not required to examine the record page by page in order to determine the existence of the matter to which appellant complains. *Reed v. State*, 927 S.W.2d 289, 291 (Tex.App.—Fort Worth 1996, no pet'n). However, because appellant's legal and factual sufficiency points require us to examine the entire record, we will address the merits of his first two points.

---

**8.** When the forged check and appellant's written confession to the forgery were introduced into evidence during the guilt-innocence phase, appellant's counsel affirmatively announced that he had "no objection."

**9.** Telephone records indicate that a call to appellant's brother's number was placed from the victim's telephone at 9:27 p.m. on June 3, 1993.

**10.** Because this appeal was perfected prior to September 1, 1997, all references to the Texas Rules of Appellate Procedure are to those rules as they existed prior to that date.

Texas Rule of Criminal Evidence 404(b) provides that evidence of other crimes, wrongs or acts is inadmissible to prove the character of the accused in order to show that he acted in conformity therewith on a particular occasion. Tex.R.Crim.Evid. 404(b); *Abdnor v. State,* 871 S.W.2d 726, 738 (Tex.Cr.App.1994). The rule further provides however, that evidence of other crimes, wrongs or acts may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. Tex. R.Crim.Evid. 404(b). Texas Rule of Criminal Evidence 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence."

At the pre-trial hearing, appellant proffered 404(b) and 403 objections in response to the State's proposed introduction of evidence showing that he had a history of physically assaulting his father, his ex-wife, and the victim. Due to differences in the law regarding the admissibility of this evidence, we divide our discussion into three categories: (1) assaults on the victim, (2) assaults on appellant's father, and (3) assaults on appellant's ex-wife.

### ASSAULTS ON THE VICTIM

With regard to the evidence of assaults on the victim, we hold that the trial court did not err by overruling appellant's 404(b) and 403 objections because the admissibility of that evidence was controlled by Article 38.36(a) of the Code of Criminal Procedure, not by Texas Rule of Criminal Evidence 404(b) or 403. Article 38.36(a) provides that:

[i]n all prosecutions for murder, the state or defendant shall be permitted to offer testimony as to **all relevant facts and circumstances surrounding** the killing and **the previous relationship existing between the accused and the deceased,** together with all relevant facts and circumstances going to show the condition of the

mind of the accused at the time of the offense.[11] (Emphasis added).

The Texas Rules of Criminal Evidence "govern criminal proceedings in courts of Texas except where otherwise provided." Tex. R.Crim.Evid. 101(b). Where an inconsistency exists between the Rules of Criminal Evidence and the Code of Criminal Procedure, the Code of Criminal Procedure controls. Tex.R.Crim.Evid. 101(c).

A plain reading of Article 38.36(a) reveals that it allows the admission of all relevant evidence of the previous relationship between the accused and the murder victim. It therefore incorporates Rule of Criminal Evidence 401 which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would otherwise be without the evidence." Tex.R.Crim.Evid. 401.

Applying Article 38.36(a) to the instant case, appellant was the live-in boyfriend of a woman who suddenly vanished without a trace or plausible explanation, and the evidence of their relationship indicates an abundance of physical abuse. Because the evidence of physical abuse has a tendency, however slight, to make it more probable that appellant murdered the victim, than without it, the evidence was relevant. Because this evidence pertained to the prior relationship between the victim and appellant, and was relevant to a determination of whether appellant committed the murder, it was admissible under Article 38.36(a). In other words, when a defendant is accused of murder, and the extraneous offense evidence proffered by the State (assuming it is relevant), involves the former relationship between the accused and the victim, it is admissible notwithstanding Rule 404(b).

Furthermore, evidence of prior hostile offenses by the accused against the victim is admissible as circumstantial evidence of motive. *Bisby v. State,* 907 S.W.2d 949, 958 (Tex.App.—Fort Worth 1995, pet'n ref'd). Although motive is not an essential

---

11. Prior to the enactment of Texas Code of Criminal Procedure Annotated Article 38.36 (Vernon Pamph.1998), this language was codified in section 19.06 of the Penal Code.

element of murder, evidence of motive is always admissible because it is a circumstance tending to prove the commission of the offense. *Bush v. State,* 628 S.W.2d 441, 444 (Tex.Cr.App.1982); *Bisby v. State,* 907 S.W.2d at 958.

We now turn to appellant's 403 objection. Because Article 38.36(a) provides for the admission of "all relevant facts" it conflicts with, and consequently overrides, Rule of Criminal Evidence 403 which provides that, "although relevant, evidence may be excluded.…" Stated differently, Rule 403 provides that even though evidence is relevant, it may still be inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. In direct contradiction, Article 38.36(a) provides for the admission of "all relevant facts." It makes no allowance for a probative versus prejudicial balancing test. Consequently, we hold that with regard to the evidence of physical abuse inflicted upon the victim, appellant's 404(b) and 403 objections were invalid.

■ We note that the trial court did not consider Article 38.36(a) in its ruling on the admissibility of this evidence. However, a decision by a trial court which is correct on any theory of the law applicable to the case will not be disturbed on appeal. *Calloway v. State,* 743 S.W.2d 645, 651–52 (Tex.Cr.App. 1988); *Bisby v. State,* 907 S.W.2d at 953. Accordingly, with regard to the admission of evidence pertaining to prior physical assaults on the victim, appellant's first two points are overruled.

### ASSAULTS ON APPELLANT'S FATHER

■ Ordinarily, when a court overrules a defendant's pre-trial objection to the admission of evidence, the error is preserved and the defendant need not object to the same evidence again at trial. Tex.R.App.P. 52(b); *Ethington v. State,* 819 S.W.2d 854, 858 (Tex. Cr.App.1991); *Traylor v. State,* 855 S.W.2d 25, 26 (Tex.App.—El Paso 1993, no pet'n). However, when a defendant affirmatively states during trial that he has "no objection"

to the challenged evidence, he waives any error in its admission despite having previously preserved error with a pre-trial objection. *Dean v. State,* 749 S.W.2d 80, 83 (Tex. Cr.App.1988); *Matter of R.S.C.,* 940 S.W.2d 750, 752 (Tex.App.—El Paso 1997, no pet'n); *Traylor v. State,* 855 S.W.2d at 26.

■ During the pre-trial hearing, appellant proffered timely 404(b) and 403 objections to the proposed introduction of evidence involving assaults against his father. Because these objections were overruled on the record, appellant initially preserved his error. However, when appellant subsequently acquiesced in the introduction of pictures and documents depicting the assault on his father by stating that he had "no objection," he waived his pre-trial objection and any error which may have resulted from the admission of this evidence.[12]

### ASSAULTS ON APPELLANT'S EX–WIFE

■ Just prior to his ex-wife testifying, appellant renewed, and the trial court overruled, his 404(b) and 403 objections. As previously stated, her testimony was limited to appellant's violent nature and the physical abuse she suffered at his hands while he was intoxicated. In reviewing the trial court's decision to admit this evidence, we must afford the trial court great discretion. *Montgomery v. State,* 810 S.W.2d 372, 378 (Tex.Cr. App.1991). In other words, if the trial court's decision to admit this evidence was within the "zone of reasonable disagreement," we will not intercede. *Id.* at 391. Here however, because by no reasonable perception of common experience can we conclude that this evidence served any purpose other than character conformity, we hold the trial court abused its discretion in allowing its introduction over appellant's timely 404(b) objection.

■ Under harm analysis, no error will be predicated upon the admission of evidence unless a substantial right of a party is affect-

---

12. Although not previously stated as grounds for affirming the trial court's decision to allow in evidence of appellant's physical abuse of the victim, this same rule could have been applied to

that evidence because appellant's counsel stated that he had "no objection" when the protective order evidence was offered by the State.

ed. Tex.R.Crim.Evid. 103(a); *Ethington v. State*, 819 S.W.2d at 858. Appellant's ex-wife testified to his excessive use of alcohol and the violence which followed. This testimony was similar, and in some instances identical, to the abundance of other evidence which was both previously and subsequently admitted. Being cumulative, its admission added little to the State's case and did not affect appellant's substantial rights. Consequently, any error in its admission was harmless. *Navarro v. State*, 863 S.W.2d 191, 198 (Tex. App.—Austin 1993, pet'n ref'd). Stated differently, we are confident that the error in admitting this testimony was harmless beyond a reasonable doubt. Tex.R.App.P. 81(b)(2); Tex.R.Crim.Evid. 103(a). Appellant's first two points of error are overruled.

### POINTS OF ERROR (3) & (4)

By points three and four, appellant contends the evidence is (4) legally and (3) factually insufficient to sustain his conviction. Again, we disagree.

When an appellant challenges both the legal and factual sufficiency of the evidence, we must first determine whether the evidence is legally sufficient to support the verdict. *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Cr. App.1996). In conducting a legal sufficiency review, we must determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *see also Geesa v. State*, 820 S.W.2d 154, 157 (Tex.Cr.App.1991). As an appellate court, we should uphold the jury's verdict unless it is irrational or unsupported by more than a mere modicum of evidence. *Moreno v. State*, 755 S.W.2d 866, 867 (Tex.Cr.App.1988).

After conducting a legal sufficiency review under *Jackson*, we may proceed with a factual sufficiency review. *Clewis v. State*, 922 S.W.2d at 133. In conducting a factual sufficiency review, all the evidence is viewed without the prism of "in the light most favorable to the prosecution" and the verdict is set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State*, 922 S.W.2d at 129.

Before we can determine whether the evidence is legally sufficient to sustain the conviction, we must determine the essential elements the State was required to prove. Appellant was indicted for violating Texas Penal Code Section 19.02(b)(1) (Vernon 1994), by intentionally or knowingly causing the death of the victim. The jury was charged accordingly. The State was therefore required to prove that appellant intentionally or knowingly caused the victim's death.

The State's inability to produce and identify the body or remains of the victim does not preclude a murder conviction so long as the corpus delicti is proven by circumstantial evidence. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Cr.App.1997); *Fisher v. State*, 851 S.W.2d 298, 303 (Tex.Cr.App.1993). The corpus delicti of murder is established if the evidence shows the death of a human being caused by the criminal act of another. *Fisher v. State*, 851 S.W.2d at 303. Under the common law corpus delicti rule an extra-judicial confession alone is insufficient to support a murder conviction. *Fisher v. State*, 851 S.W.2d at 302; *Jackson v. State*, 652 S.W.2d 415, 419 (Tex.Cr.App.1983). However, if there is some independent evidence tending to corroborate the confession, then the confession may be used to establish the corpus delicti. *Fisher v. State*, 851 S.W.2d at 302. The corpus delicti need not be proven independently of the extra-judicial confession, there need only be independent evidence tending to prove the corpus delicti. *Id.* at 302–03. Under the corpus delicti rule, our task is to consider all the record evidence, except appellant's extra-judicial confession, to determine whether the victim was actually murdered by someone. *Fisher v. State*, 851 S.W.2d at 303.

After viewing the evidence in the light most favorable to the verdict, we hold that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Appellant's extensive history of physically assaulting the victim, combined with Yarbrough's testimony regarding

appellant's confession, were sufficient to establish the essential elements of the offense beyond a reasonable doubt.

■■■ Moreover, having reviewed the entire record, except the extra-judicial confession, we find a sufficient quantum of independent circumstantial evidence tending to establish the corpus delicti. The victim was a longtime resident of Post with many ties to the community; she suddenly and unexplainably disappeared without a trace, leaving her personal affairs unresolved (mail, bills, bank accounts, property taxes); she was last seen alive in the presence of appellant; appellant had a well established history of violently assaulting the victim; these assaults occurred after appellant became intoxicated, and on the day the victim disappeared, appellant was intoxicated and was seen in a remote area north of town; on the night of the victim's disappearance, appellant left town for Arkansas; when he returned to Post a few days later, he began making harassing telephone calls to the sheriff's department; he lived in the victim's house, and had stated his intention to marry her, but never reported her missing and never partook in searching for her; he forged a check on the victim's account after she disappeared; he admitted to forging it on June 20, but could not explain why he dated the check June 3, the date the victim disappeared; extensive searches for the victim by law enforcement and members of the community failed to locate the victim. A rational jury could have concluded that this circumstantial evidence tended to corroborate appellant's confession and, therefore, establish beyond a reasonable doubt that the victim was killed by a criminal act of appellant. Point of error four is consequently overruled.

■■■ Finally, after viewing all the evidence without the prism of "in the light most favorable to the prosecution," we hold the evidence is factually sufficient to support the verdict. Appellant made an extra-judicial confession to killing the victim and then burning her body beyond recognition. The evidence of a physically abusive relationship between appellant and the victim, and the circumstantial evidence surrounding the victim's unexplained disappearance, tend to corroborate appellant's confession. On the other hand, the circumstantial evidence of the victim's unexplained disappearance, combined with eyewitness reports of a woman matching the victim's description, dirty, unkempt, and wrapped in a blanket, support appellant's hypothesis that the victim was overcome by Alzheimer's and simply wandered off. However, the reasonable hypothesis analytical construct approach to circumstantial evidence cases has been abrogated. *See Geesa v. State,* 820 S.W.2d at 161. Therefore, despite the fact that the circumstantial evidence could have been interpreted as supporting appellant's hypothesis, because it also corroborated appellant's confession, we do not believe the jury's verdict was so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. Point of error three is overruled.

Accordingly, the judgment is affirmed.

